[Civ. No. 50533. Second Dist., Div. Five. June 15, 1977.]

LONNIE JACKIE WILSON, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
THE PEOPLE, Real Party·in Interest.

COUNSEL

Weitzman & Fidler, Howard L. Weitzman and Larry Fidler for Petitioner.

No appearance for Respondent.

John K. Van de Kamp, District Attorney, Harry B. Sondheim and George M. Palmer, Deputy District Attorneys, for Real Party in Interest.

OPINION

**STEPHENS, J.**—This petition for writ of prohibition presents a most troubling question, to wit: what remedy lies when a police officer illegally and surreptitiously eavesdrops on and records a conversation between a criminal defendant and his attorney while the defendant is in custody.

The facts are these: On September 30, 1976, 13-year old Latanya W. and her 12-year old brother Eric were walking home from school. In a field they met a man who, after some conversation, sent Eric on his way and raped Latanya. The rapist informed Latanya that his name was Mad Dog. Latanya got a good look at her attacker. She noticed some writing on his arm and a black mark under his eye which she described as a birthmark.

When Latanya got home she reported the attack and was taken to a hospital for examination. She told police that her attacker was 5 feet 6, 145 pounds, approximately 16 or 17 years old, and that he went by the name Mad Dog. A check of Compton Police Department Gang Detail records turned up petitioner's name, an address on Wall Street, and the information that he went by the name of Mad Dog. Deputy Sheriff Bland[1] knew that petitioner had moved out of the area, but that he had a younger brother still at home. He thought that the younger brother might have adopted the name Mad Dog to enhance his image.

About three hours after the assault on Latanya, Bland brought petitioner's younger brother and his mother to Latanya's house for

---

[1]The crime was originally reported to the Compton police. The investigation was taken over by the Los Angeles County Sheriff's Department, however, when it was learned that the offense had occurred in Carson.

possible identification. Before having her view the brother, Bland told Latanya not to draw any conclusions as to the subject's guilt merely because he was in custody and in handcuffs; that the police wanted to punish the guilty and clear the innocent. Latanya viewed petitioner's brother and stated that he was not her assailant, that the assailant was older and taller.

Bland drove petitioner's mother and brother home, then went to the sheriff's station and compiled an assemblage of six photographs of individuals who were nicknamed Mad Dog. Petitioner's photograph was not among them. Bland returned to Latanya's house and advised her that they had some photographs to show her, again admonishing her not to presuppose that the assailant's photograph would be among them. Latanya looked at the photographs. She said that her assailant's photograph was not in the group, but she recognized three or four of the photographs as men in the neighborhood who used the name Mad Dog. Separately from Latanya, Bland showed the photographic assemblage to Eric. He recognized one of the photographs as a man named Mad Dog, but he too said that the assailant's picture was not in the group.

Bland then returned to petitioner's mother's house and asked her if she had a photograph of petitioner which he might use. He had previously searched the station files without success for a photograph of petitioner. Bland told petitioner's mother that if she gave him a photograph it might help clear petitioner or it might point the finger of suspicion at him. She gave Bland a photograph which she said he could use. It was a color photograph, larger than the mug shots he had earlier shown the victim. The photograph depicted petitioner in a kneeling position. Bland took the photograph to Latanya's house and showed it to her, after again admonishing her to identify it only if she was certain that it was the culprit. Latanya identified petitioner as her assailant. Eric was then brought into the room, similarly admonished, and shown the photograph of petitioner. He too identified it.

On October 6, 1976, petitioner was represented by an attorney named Mitchell. She telephoned the sheriff's station, spoke to a sergeant named Salazar, informed him that she was an attorney, that she represented petitioner and that she would surrender him to Salazar at the station later that day. Mitchell drove petitioner to the station, but as she and petitioner were walking through the parking lot, petitioner was seized by two deputies, removed from Mitchell's presence and taken into the station. Despite Mitchell's demand that she be allowed to see her client

and that no effort be made to interrogate him outside her presence, Mitchell was not allowed to see petitioner for an hour or two. She and petitioner were then permitted to confer in a room by themselves in what they believed was a private setting. Their conversation was surreptitiously recorded. Deputy District Attorney David Disco testified that Sergeant Salazar told him that he had taped the conversation.[2] Salazar played the tape recording for a number of people in the sheriff's station. One member of the sheriff's department related a portion of the contents of the tape to a member of the district attorney's staff. All told, a probable minimum of eight and a maximum of twenty unauthorized persons either heard the tape or were told of its contents. Mitchell testified that in the conversation she and petitioner discussed defense strategy for the case at bar.

On October 7, 1976, Latanya and Eric both picked petitioner out of a lineup. Also on October 7, 1976, Mitchell learned of the possible existence of the tape recording of her conversation with petitioner. She contacted the district attorney's office to verify her suspicions. Over the next few days she made several additional calls to the district attorney's office seeking information regarding the tape, but was put off each time. The existence of the tape was finally confirmed by Deputy District Attorney Rabichow, the prosecutor in charge of petitioner's case.

Criminal charges were filed against petitioner. On November 26, 1976, following a preliminary hearing, the charges were dismissed by the magistrate in Division 35 of the Los Angeles Municipal Court because of the infringement of petitioner's right to counsel. The charges were refiled and a new preliminary hearing was held, this time in Division 33 of the Los Angeles Municipal Court. At this hearing the above described evidence regarding the crime and the identification procedures which led to petitioner's arrest was adduced; the tape and the transcript made from it were placed under permanent court seal and evidence contained therein or derived therefrom was ruled inadmissible against petitioner; and it was stipulated that Deputy District Attorney Rabichow had no knowledge of the contents of the tape. Petitioner was bound over for trial. A motion to dismiss pursuant to section 995 of the Penal Code was denied and this petition followed.

Petitioner asserts that the taping of his conversation with his lawyer precludes his ever having a fair trial on the pending charges and that the

[2]Salazar *invoked the Fifth Amendment when questioned about the tape at petitioner's* preliminary hearing.

only suitable remedy for the violation of his constitutional rights is dismissal of the charges. Additionally he claims that he was further denied his right to counsel at the preliminary hearing because the tape recording created a conflict of interest between himself and Mitchell. Finally, he claims that the identification procedures which were followed with the victim and her brother denied him due process of law.

■ We find that this last contention has no merit. In fact, we believe that the procedure followed was entirely logical and eminently fair. Petitioner points to testimony by Latanya that when the officers returned to her house the third time with petitioner's photograph she assumed that they had finally found the right man. The People bear no responsibility for the witness' assumptions. They admonished her to be cautious in her identification and it appears that, despite her assumptions, she was. Petitioner complains that the photograph showed him in a kneeling position and that the victim testified that he was in this position during the attack. Again the People bear no responsibility for this coincidence since it was petitioner's mother who selected the photograph which was the only one available to the officer. The same holds true for petitioner's complaint about the disparity in size and color between his photograph and the mug shots shown to the victim earlier. Petitioner further points to the discrepancy between his own height (six ft. two in.) and the description Latanya gave officers (five ft. six in.).[3] These facts may cast doubt on the victim's credibility and the defense can rightly draw a jury's attention to them. They do not render her preliminary hearing testimony incompetent, however. Furthermore, both Latanya and Eric testified at the preliminary hearing that they recognized petitioner from the incident, not from the photographs. Petitioner was not denied due process.

■ Petitioner's contention that a conflict of interest existed between himself and Mitchell at the preliminary hearing is predicated on the permissible, but not necessary, inference that the contents of the tape would expose Mitchell to the risk of prosecution or at least show her in an unfavorable light. If such is the case, regardless of what conflict may otherwise exist between Mitchell and petitioner, it is clear that it was to the advantage of both that the tape be suppressed, that its contents not be disclosed and that the charges against petitioner be dismissed. Furthermore, petitioner was represented at the preliminary hearing not

---

[3]At the preliminary hearing Latanya, upon viewing petitioner, estimated his height at five feet nine inches.

just by Mitchell, but by an attorney named Shencopp who also participated actively in the proceeding, as did an attorney named Adler who appeared in an amicus capacity on petitioner's behalf. Petitioner has failed to demonstrate that he was denied his right to counsel at the preliminary hearing because of a conflict between himself and Mitchell.

We turn now to the most serious issue which petitioner has raised, namely that the taping of his conversation with his attorney has so infected the proceedings against him as to require that the information be dismissed and that the People be forever barred from prosecuting him on the instant charges. It is undisputed at this point that the tape in fact exists and that it was made illegally. We thoroughly deplore and condemn the conduct which produced the tape. It was not only an outrageous violation of petitioner's most fundamental constitutional rights, but the mere fact that it could happen poses a potential threat to the rights of each of us. Justice demands that the People not be permitted to benefit in any way from the existence of the tape, from any information it may contain, or from any evidence to which that information might lead. But justice also demands that the man who attacked Latanya be prosecuted and on the record before us there is probable cause to believe that petitioner is that man. It is our duty to reconcile these conflicting interests to the extent that it is possible to do so.

Federal courts which have considered the issue have not required automatic dismissal of criminal charges when the confidentiality of a defendant's relationship with his attorney has been breached. Rather where the issue was raised on a post-conviction appeal it has been held that the conviction must be reversed and the cause remanded for a new trial at which the prosecution would not be permitted to make use of the illegally obtained evidence or its fruits. (*O'Brien* v. *United States,* 386 U.S. 345 [18 L.Ed.2d 94, 87 S.Ct. 1158]; *Hoffa* v. *United States,* 385 U.S. 293; 307-308 [17 L.Ed.2d 374, 384-385, 87 S.Ct. 408]; *Black* v. *United States,* 385 U.S. 26, 28-29 [17 L.Ed.2d 26, 28-29, 87 S.Ct. 190]; *Caldwell* v. *United States,* 205 F.2d 879, 881; *Coplon* v. *United States,* 191 F.2d 749, 760 [89 App.D.C. 103].)[4]

---

[4]Petitioner's reliance on the trial court's decision to dismiss the charges in *United States* v. *Russo & Ellsberg,* No. 9373 (C.D.Cal., May 11, 1973) is not well placed. Not only is that decision of no precedential value because of the government's decision not to appeal, but it must be regarded as a wholly unique situation because of the political context in which it arose.

In its most recent pronouncement on the subject (*Weatherford* v. *Bursey,* 429 U.S. 545 [51 L.Ed.2d 30, 97 S.Ct. 837]), the United States Supreme Court again adhered to this view stating, " . . . that when conversations with counsel have been overheard, the constitutionality of the conviction depends on whether the overheard conversations have produced, directly or indirectly, any of the evidence offered at trial."[5]

California cases have long recognized the right of an accused to confer privately with his attorney. (*In re Qualls,* 58 Cal.App.2d 330 [136 P.2d 341]; *In re Snyder,* 62 Cal.App. 697 [217 P. 777]; *In re Rider,* 50 Cal.App. 797 [195 P. 965].) The absence of California cases dealing with an infringement of that right, such as occurred here,[6] leads us happily to conclude that the incident before us is an isolated one and that the prophylactic adopted by the federal courts is sufficient to assure that it does not happen again.

■ Of course, whether or not the People will be able to demonstrate in any given case that they have sufficient evidence to maintain a prosecution which is neither derived from nor tainted by the illegal intrusion into the attorney-client relationship will depend upon the particular facts of the case. The burden of such proof lies with the People and certainly, as the court noted in *Hoffa* v. *United States, supra,* 385 U.S. 293, there may be situations where it is not possible for the People to proceed. ■ In the case at bar, however, we are convinced beyond a reasonable doubt (*Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824]) that petitioner's right to a fair trial will not have been infringed if the People are allowed to proceed to trial upon

---

[5]*Weatherford* was a civil suit brought by a criminal defendant (Bursey) against an undercover agent (Weatherford) under the Federal Civil Rights Act (42 U.S.C. § 1983) following Bursey's conviction in a trial in which Weatherford testified. Weatherford had overheard Bursey's conversations with his attorney at a time when Weatherford's true identity was still being kept secret by the government and when Bursey supposed him to be his codefendant. In denying that Bursey had established a cause of action against Weatherford under 42 United States Code, section 1983, the court stated: "There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by Weatherford, there was no violation of the Sixth Amendment insofar as it is applicable to the States by virtue of the Fourteenth Amendment." (429 U.S. at p. 558, 51 L.Ed.2d at p. 41.)

[6]In *People* v. *Holzer,* 25 Cal.App.3d 456 [102 Cal.Rptr. 11], mail between defendant and his attorney was intercepted and read. This court ruled that defendant having asked only for suppression of evidence which thereby came into the People's hands, and having obtained this relief from the trial court, could not ask for greater relief on appeal—e.g., dismissal of the charges. In addition, we adverted to *Black* v. *United States,* 385 U.S. 26 [17 L.Ed.2d 26, 87 S.Ct. 190], wherein the Supreme Court had held that intrusion into defendant's relationship with counsel did not automatically vitiate the prosecution. (25 Cal.App.3d at p. 463, fn. 3.)

evidence such as they adduced at the preliminary hearing, namely the testimony of the victim, her brother and Deputy Bland regarding the commission of the crime and the witnesses' identification of petitioner as the perpetrator.[7]

In view, however, of defense counsel's testimony that the taped conversation with petitioner involved a discussion of defense strategy, we cannot permit the People to offer rebuttal to any evidence which may be introduced by the defense in petitioner's forthcoming trial, nor can the prosecutor be permitted to cross-examine defense witnesses, except to impeach them with appropriate prior felony convictions, knowledge of which the People would gain from their own files, unless the People, outside the presence of the jury, first demonstrate to the satisfaction of the trial court, beyond a reasonable doubt (*Chapman* v. *California, supra*), that the evidence they seek to adduce derives in no way from the tape. Unless the People can thus prove an independent and untainted source for their evidence, no court could be sure that the People were not aided in acquiring it by overhearing the conversation between petitioner and Mitchell unless that court further infringed petitioner's right to counsel by listening to the tape—a remedy which we cannot force upon petitioner as it would only compound the injustice which has already been perpetrated.

The order to show cause, previously issued herein, is discharged. The stay order is terminated. The petition for writ of prohibition is denied. The matter is remanded to the respondent court for further proceedings consistent with the views expressed herein.

Kaus, P. J., and Hastings, J., concurred.

A petition for a rehearing was denied June 29, 1977, and petitioner's application for a hearing by the Supreme Court was denied August 11, 1977. Bird, C. J., and Mosk, J., were of the opinion that the application should be granted.

---

[7]At oral argument before this court, the People indicated that proceeding to trial on such limited evidence would be satisfactory to them.