998 P.2d 453

**STATE of Arizona, Appellant,**

v.

**David Michael PECARD, Appellee.**

No. 1 CA–CR 98–0682.

Court of Appeals of Arizona,
Division 1, Department B.

Oct. 12, 1999.

Review Denied April 18, 2000.*

* Justice Feldman voted to grant review.

Richard M. Romley, Maricopa County Attorney by Arthur Hazelton, Deputy County Attorney, Phoenix, Attorneys for Appellant.

Richard D. Gierloff, Phoenix, Attorney for Appellee.

## OPINION

GERBER, Judge.

¶ 1 The State of Arizona appeals from the trial court's order dismissing with prejudice two indictments against the defendant, David Michael Pecard ("Pecard"). For the reasons stated below, we reverse the dismissal orders of the trial court.

### PROCEDURAL AND FACTUAL BACKGROUND

**A. Pecard's Indictments**

¶ 2 On December 19, 1996, Pecard was indicted on three counts of fraudulent schemes and artifices, one count of computer fraud, one count of theft, four counts of forgery and one count of sexual abuse. The state alleged that, by using a false name, Pecard, then a United States Army sergeant, insinuated himself into the Maricopa County Sheriff's Office ("MCSO"), headed by Sheriff Joe Arpaio, where he became cross-certified as a law enforcement officer. While so act-

ing, Pecard allegedly accessed the MCSO's computer system to obtain benefits and to commit crimes, including fraud and sexual abuse. Using several false names, he also allegedly obtained driver's licenses and other forms of identification.

¶ 3 On September 30, 1997, Pecard was again indicted on two additional counts of fraudulent schemes and artifices. This indictment alleged that, pursuant to a scheme or artifice to defraud, he obtained several credit cards and student loans from various financial institutions and state and federal governments.

¶ 4 As of December 1996, Pecard also faced court-martial charges brought by the United States Army at Fort Huachuca, Arizona, for three counts of desertion plus one count of making a false official statement and fraudulent enlistment. At the time Captain Edward Dillard, a senior defense counsel in the Judge Advocate General Corps, was representing Pecard in the court-martial proceedings.

¶ 5 Pursuant to Arizona Rule of Evidence 404(b), the state filed a notice of intent to use evidence at trial of Pecard's fraudulent enlistment in the Army, his use of aliases, his desertion, and his dishonorable discharge. The state also filed an allegation of several historical prior felony convictions.

**B. MCSO's Jail Conduct**

¶ 6 Pecard's motion to dismiss both state indictments claimed that MCSO violated his rights under the Fifth and Sixth Amendments of the United States Constitution and Article II, sections 4 and 24 of the Arizona Constitution. Specifically he alleged MCSO 1) denied him access to his attorneys, 2) monitored and recorded his telephone conversations with Captain Dillard, 3) illegally opened privileged mail and 4) removed legal materials from his cell.

1. *Denial of Access to Attorneys*

¶ 7 The following information appears in the record of the trial court's evidentiary

hearing.[1] On December 5, 1996, Pecard was placed in solitary confinement in the Maricopa County Jail as a security risk. From his first day there, he was treated differently from the other prisoners, including those others in solitary confinement. The jail commander, Captain David Alster, gave "marching orders" that Pecard was to receive no privileges, including outside telephone calls and visitations, unless approved by him. He also issued an order to jail personnel to interfere with Pecard's ability to make calls to his attorneys.

¶ 8 Captain Alster restored Pecard's privileges four days later on December 9, 1996. However, even after that date, he would not approve Pecard's written telephone privilege requests designating Richard Gierloff and Captain Dillard as his attorneys in the state and federal proceedings respectively. He also refused to recognize Captain Dillard as one of Pecard's attorneys until January 30, 1997 even though the Army had placed a detainer on Pecard at the jail on December 6, 1996.

¶ 9 Pecard filed several grievances with jail officials about the denial of access to his attorneys. He claimed he was unable to telephone any attorney until late in December 1996. For reasons not fully explained in the record, some of his telephone calls to his attorneys were not connected. Because he believed MCSO randomly blocked his calls, Pecard had jail personnel document his inability to complete the calls. During one incident in which he was engaged in a conference call with Captain Dillard and attorney Gierloff, jail personnel interrupted the call and demanded that he immediately turn over the phone to them.

2. *Recording Telephone Calls to Captain Dillard*

¶ 10 Because charges in the state cases could detrimentally affect the court-martial charges and vice versa,[2] attorney Gierloff and

Captain Dillard shared information and attempted to work as an integrated defense team. As Fort Huachuca is 310 miles from the Maricopa County Jail, telephone communication between Pecard and Captain Dillard was necessary to prepare a defense.

¶ 11 In January 1997, the General Investigation Division of MCSO ordered Sergeant LaPoint to monitor and tape record all Pecard's telephone conversations, without exception for privileged calls, and to take notes on the calls and report the contents to Detective Brutsche of the Phoenix Police Department who was investigating Pecard's state cases. According to LaPoint, the purpose of this monitoring was to listen "for things that could be used in the prosecution of Mr. Pecard."

¶ 12 Sergeant LaPoint began recording Pecard's telephone conversations on January 13, 1997. The recorded calls were preceded by an advisory message indicating that the calls were being recorded. After Captain Alster acknowledged that Captain Dillard was Pecard's attorney, Captain Alster notified T–Netix, the company in charge of the jail's telephone system, to stop recording Pecard's calls to Captain Dillard.

¶ 13 On January 30, 1997, Sergeant LaPoint ceased monitoring and recording calls between Pecard and Captain Dillard. However, the advisory message continued to precede every phone call placed by Pecard to Captain Dillard until October 1997. When Pecard complained to jail authorities, he was told the advisory message was a figment of his imagination. MCSO did not bring the problem with the computerized system to T–Netix's attention until two weeks before the trial court's evidentiary hearing.

¶ 14 Captain Dillard was aware of the advisory message preceding each telephone call. He believed Pecard's conversations were being recorded even after January 30, 1997. He and Pecard agreed to not discuss on the telephone any information that was "case-

---

1. We defer, as we must, to the trial court's determination of conflicting factual evidence.

2. The military investigators in the court-martial proceedings conducted a joint investigation with the Phoenix Police Department and MCSO. Phoenix Police Department detectives were listed

as witnesses in the court-martial proceeding. According to Captain Dillard, the issues in the court-martial proceeding were intertwined with issues in the state cases and the same facts generated charges in both proceedings.

sensitive" for either the court-martial or the state cases, leaving such discussions for rare face-to-face meetings.

¶ 15 On March 3, 1997, the trial court ordered that all tape recordings of conversations between Captain Dillard and Pecard be turned over to attorney Gierloff. It also ordered MCSO to include Captain Dillard as Pecard's attorney of record. All but one tape was produced pursuant to the court order. The missing tape, even though it had been stored in the same location as the other tapes, was not produced until the evidentiary hearing. Sergeant LaPoint claimed the omission was accidental.

¶ 16 This missing tape contained a conversation occurring on January 21, 1997 between Pecard and Captain Dillard about whether to pursue an insanity defense in the court-martial proceeding. This defense was not an issue in the state court proceedings. In spite of the contents of this tape, Detective Brutsche testified that the only information Sergeant LaPoint conveyed to him from these taped conversations concerned Pecard's difficulty in receiving back pay from the military.

### 3. Opening Privileged Mail

¶ 17 Because he was considered a security risk, MCSO jail officers ordered Pecard's nonprivileged mail to be opened, read by prison authorities and pertinent information conveyed to Detective Brutsche. Standard MCSO policy states that "privileged" mail includes correspondence with attorneys, law enforcement officials, court officials, news media and public officials, and that none of this kind of mail is to be opened except in the presence of the defendant.

¶ 18 In spite of this policy, MCSO opened some of Pecard's privileged mail outside his presence. In September 1997, Lieutenant Pinto of MCSO ordered that he personally receive all Pecard's mail to ensure that privileged mail was not improperly opened. However, as late as October 1997, MCSO was still opening Pecard's privileged mail outside his presence.

¶ 19 Beginning in May 1997, Pecard filed numerous grievances about this treatment. The contents of this mail, which included military legal mail, correspondence from attorney Gierloff, mail from the United States District Court as well as mail from the United States Senate, is unknown. In response to Pecard's complaints, an external referee investigated and issued a report in November 1997, finding mail policy violations without intent by MCSO and without damage to Pecard.

¶ 20 At the trial court's evidentiary hearing, MCSO claimed that opening Pecard's privileged mail was inadvertent, merely the result of the officers' "zeal" to timely process mail. The trial court found this position "not worthy of belief." Because of Pecard's repeated grievances coupled with the outside investigation by the external referee and the "enormity of the attention that was brought to bear on the defendant's mail," the trial court found MCSO's interference with Pecard's privileged mail intentional and deliberate.

### 4. Seizure of Legal Materials

¶ 21 Pecard was absent from the jail between November 1997 and December 6, 1997 because of his court-martial proceeding in Fort Huachuca. He took with him only those legal materials needed for those proceedings and left behind in his cell other legal documents. According to Pecard's testimony, these materials included logs of communications with attorney Gierloff, work product generated from notes and conversations with Gierloff and Captain Dillard and miscellaneous correspondence relating to the state cases as well as other personal items. When he returned to the jail, these items were missing from his cell. MCSO responded to his complaint by telling him these documents could not be found.

¶ 22 After Pecard filed a grievance about his missing property, Sergeant Engleking of MCSO conducted an investigation with inconclusive results. He later concluded that Pecard left nothing in his cell except trash. MCSO then offered Pecard $15.00 to resolve his grievance; he refused it. The trial court found the more credible evidence was that Pecard left the property in his cell and

MCSO both intentionally seized it and deliberately refused to return it.

## C. Trial court's Findings and Conclusions

¶ 23 After hearing the evidence, the trial court dismissed the indictments with prejudice.[3] The court made specific factual findings pertaining to each category and general findings in accordance with *State v. Warner*, 150 Ariz. 123, 722 P.2d 291 (1986). The trial court found that MCSO deliberately opened Pecard's mail outside his presence. It also found that MCSO had intentionally seized his property from his cell. It concluded that:

> After seven days of hearing, after having reviewed and considered the evidence and argument of the counsel, and most importantly, after having had the ability to judge the credibility of witnesses, the Court is compelled to find that the MCSO has simply trampled on the defendant's Constitutional rights time and time again. The conduct was broad in scope and considered.
>
> . . . .
>
> Now, specifically as to the *Warner* findings, the Court finds that:
>
> 1. The Maricopa County Sheriff's Office motive behind the treatment of the defendant in all these instances was harassment and an attempt to illegally bring evidence used against him.
>
> 2. The use made of information, the Court is not certain.
>
> 3. That the many intrusions were deliberate, calculated and occurred over a substantial period of time.
>
> 4. The benefit to the State, the Court is not certain.
>
> 5. The prejudice. The defendant and his attorneys were unable to prepare a proper defense in both military and state court proceedings, that they were unable to fully and freely discuss those proceedings, that defendant was even denied the right to talk to an attorney for a period of time, the defendant's

> legal mail was read, the defendant's property was seized, and the defendant was singled out for harassment and adverse treatment, certainly amount to prejudice.
>
> I have balanced the interest of the accused and the interest of society in the effective administration of justice, and I would much rather that this case be decided in the typical fashion by a jury on the merits. However, under the totality of the circumstances, that is not to be.
>
> The inappropriate and unconstitutional conduct by the Maricopa County Sheriff's Office warrants dismissal with prejudice.

## STANDARD OF REVIEW

¶ 24 The decision whether to grant a motion to dismiss is within the sound discretion of the trial court, which will not be disturbed absent an abuse of discretion. *See State v. Hansen*, 156 Ariz. 291, 294, 751 P.2d 951, 954 (1988). This court does not retry conflicts in the evidence. *See State v. Warner*, 159 Ariz. 46, 50, 764 P.2d 1105, 1109 (1988). Further, "[t]he credibility of witnesses is a question of fact ... and will not normally be disturbed on appeal." *State v. Burr*, 126 Ariz. 338, 341, 615 P.2d 635, 638 (1980). The central issue on appeal is a legal one rather than one of credibility.

## DISCUSSION

¶ 25 The state claims the trial court abused its discretion in finding Sixth Amendment violations because no evidence existed that the state benefitted from the MCSO misconduct and therefore Pecard failed to show prejudice as required by *Warner*. The state next argues that, even assuming Sixth Amendment violations, the trial court abused its discretion in dismissing the indictments rather than shaping a less drastic remedy to correct the wrongdoing. We now address each of these contentions.

---

**3.** Pecard also filed a motion to dismiss charges in the court-martial proceeding for violation of his Sixth Amendment rights by MCSO. This motion was denied. Officers of MCSO who testified at the hearing stated that recording Pecard's telephone calls to Captain Dillard affected only the state cases and had no bearing on the military case.

## A. Were There Sixth Amendment Violations?

¶ 26 The Sixth Amendment to the United States Constitution gives an accused the right to assistance of counsel for his defense. That amendment means "to assure fairness in the adversary criminal process." *United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981). Effective representation is not possible unless the defendant is able to confer in private with his attorney. *See State v. Holland,* 147 Ariz. 453, 455, 711 P.2d 592, 594 (1985). *See also* Ariz. R.Crim. P. 6.1(a) ("The right to be represented shall include the right to consult in private with an attorney ...").

¶ 27 Thus, a defendant's right to counsel includes protection from improper intrusions by the prosecutor or other government agents. *See State v. Warner,* 150 Ariz. at 127, 722 P.2d at 295. If a state agent interferes with confidential attorney-client communications, not only is there a risk of disclosure of confidential information but also such an intrusion chills free discussion between a defendant and his attorney. *See id; see also State v. Sugar,* 84 N.J. 1, 417 A.2d 474, 483 (1980) (finding that interference with confidential relationship destroys counsel's effectiveness because effective defense can follow "only when a defendant has made full and frank disclosure of knowledge of events surrounding alleged crime").

¶ 28 However, not every intrusion into the attorney-client relationship results in a denial of effective assistance of counsel. *See Weatherford v. Bursey,* 429 U.S. 545, 558, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977).[4] Whether a Sixth Amendment violation exists depends on whether the intrusions were purposeful and whether the prosecution, either directly or indirectly, obtained evidence or learned of defense strategy from the intrusions. *Id.*

¶ 29 In *State v. Warner,* our supreme court set forth a procedure to determine if a Sixth Amendment violation occurred, and if so, the appropriate relief. There, the sheriff seized defendant's papers and defense counsel's work product from defendant's cell and turned them over to the county attorney's office. After his conviction, the defendant's appeal raised a Sixth Amendment violation. The supreme court found a presumptive violation of Sixth Amendment rights and remanded for an evidentiary hearing, instructing the trial court to

make separate and detailed findings regarding the motive behind the seizure of defendant's papers, the use made of them, whether the interference with the attorney relationship was deliberate, whether the state benefitted in any way from the seizure, if the papers were used how any taint was purged in defendant's trial and whether defendant was, in fact, prejudiced.

150 Ariz. at 129, 722 P.2d at 297.

¶ 30 *Warner* concluded that the trial court must be convinced beyond a reasonable doubt that defendant was not prejudiced by the government's conduct. *Id.* at 128, 722 P.2d at 296.[5]

¶ 31 Here, the trial court found that the conduct of the MCSO was deliberate, that it occurred over a substantial period of time and that the intrusions into the attorney-client relationship intended to secure usable evidence against Pecard in the state proceedings. The court was unable to determine how the information was used or how it benefitted the state. It found prejudice to Pecard because he was denied the right to speak to an attorney for a lengthy period of time, was unable to fully and freely discuss the military and state proceedings with his attorneys and was hindered in preparing a defense. These factual findings are amply

---

4. *Weatherford* was a civil suit brought by the defendant under 42 U.S.C § 1983. The defendant claimed a violation of his civil rights following his conviction in which an undercover agent who heard conversations with defendant and his attorney testified at defendant's trial.

5. Following the remand, the trial court conducted an evidentiary hearing and found beyond a reasonable doubt that the state did not use information from the seized documents either directly or indirectly at trial and defendant suffered no prejudice as a result of the seizure. The supreme court affirmed the ruling of the trial court in *Warner,* 159 Ariz. at 52, 764 P.2d at 1111.

supported by the record and are not clearly erroneous.

■ ¶ 32 In response to the MCSO misconduct findings, the state argues that there was no Sixth Amendment violation here because the state did not gain any useful information from these telephonic intrusions. The state's test is incorrect; Sixth Amendment violations do not simply turn on the state's successful acquisition of information but more fundamentally on the interference with access to counsel. Pecard's telephone conversations were either recorded and/or the parties reasonably believed they were. Pecard could not freely discuss the facts of either his state or federal cases on the telephone, and Captain Dillard could not give him legal advice involving any sensitive material. Both were constrained in sharing information with attorney Gierloff.

■ ¶ 33 The relationship between Pecard and his attorneys suffered in both the court-martial and state proceedings from the improper telephonic surveillance. Although the interference with the attorney-client relationship between Pecard and attorney Gierloff was indirect, it put the defense in both cases at a distinct disadvantage and rendered counsel's representation in the state cases less effective. The electronic surveillance of Pecard's telephone calls to Captain Dillard alone clearly violated his Sixth Amendment rights.

■ ¶ 34 Opening Pecard's privileged mail outside his presence also violated the Sixth Amendment. While the exact content of the opened mail is unknown, it was clearly identified as legal mail [6] and was purposefully opened and read by MCSO over a period of months. Even without knowing the detailed contents, we must assume that the intercepted correspondence from Pecard's attorneys contained facts concerning the investigation of the offenses charged or defense plans and strategies.

■ ¶ 35 After Pecard presented such evidence, the burden of proof shifted to the state to prove beyond a reasonable doubt that such interception was not prejudicial. *See Matter of Kozak,* 256 N.W.2d 717, 724 (S.D.1977) (concluding that defendant must initially show that government agents intercepted confidential communication involving facts of offenses charged or defense strategy and then burden shifts to state to prove beyond reasonable doubt that interception was not prejudicial); *State v. Milligan,* 40 Ohio St.3d 341, 533 N.E.2d 724, 729 (1988) (finding that defendant must present prima facie evidence of prejudice and burden of proof then shifts to state). The state has not met its burden of proof in showing that the mail interception was not prejudicial. We must thus conclude that the opening and reading of Pecard's privileged legal mail violated his Sixth Amendment rights.

■ ¶ 36 As to the seizure of Pecard's letters from his attorneys, his logs of communications with his attorneys and notes of discussions with his attorneys, Pecard did not specifically state that the letters, logs and notes contained information about facts of his cases or defense strategies, although a reasonable inference from his testimony is that they may well have. However, unlike *Warner,* where the seized documents were preserved by the sheriff's office and could be inspected by the court, the state here could not produce any of Pecard's legal materials irretrievably taken from his cell by MCSO.

¶ 37 The information contained in these materials was within the exclusive control of MCSO. By failing to produce these materials, the state failed to rebut the presumption that Pecard's Sixth Amendment rights again were violated by their seizure. *Cf. Matter of Kozak,* 256 N.W.2d at 725 (concluding that state's inability to produce tape recordings of intercepted confidential communications with attorneys or provide testimony about them forecloses discovery of the communications by defendant and constitutes Sixth Amendment violation).

---

**6.** Pecard's privileged mail from the military may not have been as clearly labelled as his other privileged mail. However, he filed numerous grievances about the opening of the Army mail and, after September 1997, all of his incoming mail was received by Lieutenant Pinto, a man familiar with the military and its designations. Yet, his mail continued to be opened.

**B. Was Dismissal the Appropriate Remedy?**

■ ¶ 38 Given the MCSO's blatant Sixth Amendment violations, the crucial legal question becomes whether the trial court's dismissal of the indictments was the appropriate remedy. In addition to consideration of a defendant's own constitutional rights, courts have also recognized "society's interest in the administration of criminal justice." *United States v. Morrison,* 449 U.S. at 364, 101 S.Ct. 665. Courts narrowly tailor remedies to Sixth Amendment violations to avoid unnecessarily infringing on this societal interest. *See id.* As stated by the United States Supreme Court:

Our approach has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial. The premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense. Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial.

More particularly, absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate.

*Id.* at 365, 101 S.Ct. 665.

■ ¶ 39 Cases since *Morrison* have held that even when the government intrusions are intentional, dismissal of the indictment is neither automatic nor favored as the primary remedy. *Warner,* cited by the trial court, clearly so states; its message is that the trial court should first determine whether a less drastic remedy is appropriate.

¶ 40 Examples of less drastic remedies exist in the following cases. In *Wilson v. Superior Court,* 70 Cal.App.3d 751, 139 Cal.Rptr. 61, 64 (1977), police secretly taped a conversation between the defendant and his counsel in which defense strategy was discussed. The court there determined beyond a reasonable doubt that the trial could proceed based upon evidence not tainted by the illegal intrusion into the attorney-client relationship. However, it stated that all evidence derived directly or indirectly from the tape must be suppressed, that the state could not offer rebuttal to any evidence produced by the defendant or cross-examine defense witnesses except to impeach them with prior felony convictions. *See id.,* 139 Cal.Rptr. at 66.

¶ 41 In *State v. Milligan,* 533 N.E.2d at 727–28, jail authorities also secretly taped a telephone conversation between defendant and his attorney. The court remanded for a consideration of factors set forth in *Weatherford* and directed the trial court to determine if the unauthorized intrusion resulted in substantial prejudice to the defendant and to take appropriate action, including dismissal, if necessary.

¶ 42 In *State v. Sugar,* 417 A.2d at 476, law enforcement officers unlawfully eavesdropped on two conversations between defendant and his attorney which did not involve defense strategy. The court first condemned the illegal conduct of the officers and then discussed whether a Sixth Amendment violation had occurred. It found that intrusion into the attorney-client relationship requires dismissal of the case for a violation of the Sixth Amendment only "where it destroys that relationship or reveals defendant's trial strategy." *Id.* at 484. It concluded that no trial strategy was revealed, and that therefore there was no reason to impose the drastic remedy of dismissal.

¶ 43 In *Matter of Kozak,* 256 N.W.2d at 720, the sheriff and his deputy tape recorded at least fifteen telephone calls between defendant and his attorney and gave the tape to police officers. In considering whether the conduct required dismissal of the indictment, the court held that dismissal requires proof that the communications involved defense plans and strategy or facts concerning pending charges. It noted that even if the information is not divulged to the prosecutor, dismissal may be required if the information intercepted may be improperly used by state

witnesses. In such case, the state may have "so pervasively insinuated itself into the councils of the defense," so as to require dismissal. *Id.* at 722 (quoting *Hoffa v. United States,* 385 U.S. 293, 308, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966)). The court strongly condemned the conduct of the sheriff but, because the telephone conversation did not involve facts or defense strategy, found dismissal inappropriate.

¶ 44 Dismissal of charges has been found appropriate in a few cases, some decided prior to *Weatherford v. Bursey* or *United States v. Morrison. See State v. Cory,* 62 Wash.2d 371, 382 P.2d 1019, 1023 (1963) (sheriff's officers eavesdropping on private consultations between defendant and attorney "vitiated the whole criminal proceeding" and required dismissal); *United States v. Orman,* 417 F.Supp. 1126 (D.Colo.1976) (wiretap of defendant's telephone and surveillance of conferences between defendant and attorney required dismissal because the government learned of defense plans and strategy as a result of the intrusion); *United States v. Levy,* 577 F.2d 200 (3rd Cir.1978) (dismissal required where codefendant, who was informer for state, obtained confidential attorney-client communication involving defense strategy and disclosed the information to the prosecution); *Barber v. Municipal Court,* 24 Cal.3d 742, 157 Cal.Rptr. 658, 598 P.2d 818 (1979) (dismissal required where government informers secretly attended numerous meetings of defendants with counsel in which they discussed defense strategies).

■■■ ¶ 45 In the present case, the trial court found the evidence unclear as to whether the government gained or exploited information from Pecard's conversations or his seized documents.[7] For that reason, the state urges that the court should have imposed remedies short of dismissal, such as precluding Rule 404(b) evidence of the court-martial proceedings, limiting cross-examination of defense witnesses or omitting rebuttal evidence as in *Wilson v. Superior Court,* 70 Cal.App.3d 751, 139 Cal.Rptr. 61 (1977). The state also argues that dismissal was inappro-

priate because the indictment in CR 97–11045 resulted from evidence collected before the Sixth Amendment violations and, except for the seizure of Pecard's papers, the other harassing acts preceded both the indictment and Pecard's representation by counsel. As to the latter point, we note that while the Sixth Amendment may not be applicable to governmental misconduct in the preindictment stage, the Fifth Amendment right to due process is violated when government interference in an attorney-client relationship results in ineffective assistance of counsel or when a police agency engages in outrageous misconduct. *See United States v. Marshank,* 777 F.Supp. 1507, 1518–19 (N.D.Cal.1991).

■■■ ¶ 46 At this stage of the proceedings and given the present state of the record, we do not know whether and to what extent Pecard's evidence and right to a fair trial might have suffered as a result of MCSO's constitutional violations. Evidence obtained prior to MCSO's violations may escape taint but evidence of the court-martial proceeding itself, if offered pursuant to Rule 404(b), might be subject to suppression. On the present record, however, we cannot conclude that dismissal of both indictments constitutes the appropriate remedy for MCSO's Sixth Amendment violations.

¶ 47 The trial court seemingly believed that dismissal was the only remedy available to it. At the outset of the evidentiary hearing, the judge stated that "this Court is required to find that defendant has suffered some actual prejudice before I can sanction—I can enter a remedy, and if there is that showing, then *the only remedy that is appropriate is dismissal.*" (Emphasis added.) Although the prosecutor advised the court in closing argument that dismissal was inappropriate, the court's comments indicate that it considered dismissal as the only remedy.

¶ 48 Immunization of Pecard from all prosecution is a drastic remedy which may "compound the injustice which has already been perpetrated." *Wilson,* 139 Cal.Rptr. at 66. In light of the federal and state cases above

---

**7.** The court apparently did not conduct an *in camera* inspection of the tape recorded conversa- tions with Captain Dillard.

that disfavor dismissal as the prototypical remedy for Sixth Amendment violations, we conclude that it was an abuse of discretion for the trial court to dismiss the indictments outright without first considering lesser remedies assuring Pecard a fair trial. *See Matter of Kozak*, 256 N.W.2d at 723.

¶ 49 Under a record more expansive than this, dismissal may yet be appropriate. If after considering other remedies and additional evidence, the trial court finds the entire MCSO behavior so prejudicial that no other remedies will protect Pecard's right to a fair trial, dismissal may well be appropriate. At this point, however, we lack a record supporting outright dismissal.

¶ 50 In reinstating the charges against Pecard, we are constrained to observe that this opinion hardly vindicates the illegal MCSO conduct discussed above. By repeatedly tampering with Pecard's mail, his telephone calls, his legal materials and his right to counsel, the MCSO only hurt its cases against Pecard. As a law enforcement agency, MCSO is sworn to uphold the nation's law in its entirety, including the Fifth and Sixth Amendments and the presumption of innocence, regardless of zeal, circumstance or person. Its failure to do so denies the law's protections not only to the defendant but also to his alleged victims and even society as a whole. Thomas More, Lord Chancellor of England, said it well long ago:

> This country's planted thick with laws from coast to coast ... and if you cut them down ... do you really think you could stand upright in the winds that would blow then? Yes, I'd give [even] the Devil benefit of law for my own safety's sake.

Robert Bolt, *A Man for All Seasons*, 66 (Vintage 1990).

## CONCLUSION

¶ 51 We reverse the order dismissing the indictments, which are hereby reinstated. We remand to the trial court for further proceedings consistent with this decision.

CONCURRING: CECIL B. PATTERSON, Jr., Presiding Judge, Department B, and JON W. THOMPSON, Judge.