NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

MARK WILLIAM CLARY, JR., *Appellant.*

No. 1 CA-CR 13-0694
FILED 8-30-2016

Appeal from the Superior Court in Maricopa County
No.  CR2012-119994-001 SE
The Honorable Cynthia J. Bailey, Judge
The Honorable Robert E. Miles, Judge (Retired)

**CONVICTIONS AND SENTENCES AFFIRMED; SENTENCING
MINUTE ENTRY AFFIRMED AS MODIFIED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Linley Wilson
*Counsel for Appellee*

Jones, Skelton & Hochuli, P.L.C., Phoenix
By Lori L. Voepel
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Lawrence F. Winthrop delivered the decision of the Court, in which Judge Samuel A. Thumma and Judge Donn Kessler joined.

---

**W I N T H R O P**, Presiding Judge:

**¶1**        Mark William Clary, Jr. ("Clary") appeals his convictions and sentences for two counts of manslaughter, three counts of aggravated assault, and one count of leaving the scene of a fatal injury accident. Finding no reversible error, we affirm.  Pursuant to the parties' stipulation and our own review, however, we modify the sentencing minute entry to correct technical errors in that minute entry.

**FACTS AND PROCEDURAL HISTORY**[1]

**¶2**        In the early morning of April 15, 2012, Clary caused a high-speed vehicle collision on the U.S. 60 freeway in Mesa.  The trial evidence reveals Clary was driving his Chevrolet Corvette approximately twice the sixty-five mile-per-hour speed limit when his car collided with the back end of a Chevrolet Corsica and then spun into a Volkswagen Jetta.  The force of the collision crushed the Corsica, causing its rear end to intrude upon most of its passenger compartment.  The Corsica's driver and back-seat occupant died as a result of injuries sustained in the collision.   The front-seat passenger of the Corsica and the Jetta's two occupants suffered various physical injuries.

**¶3**        Before law enforcement or medical personnel arrived at the scene, eyewitnesses saw Clary climb out the driver's side window of his Corvette, scurry up the embankment, and flee into a nearby residential neighborhood.  He was apprehended approximately two to three hours later and transported to a police substation for questioning.

---

[1]    We view the facts in the light most favorable to sustaining the verdicts and resolve all reasonable inferences against Clary.  *See State v. Nelson*, 214 Ariz. 196, 196, ¶ 2, 150 P.3d 769, 769 (App. 2007).

¶4 At the substation, after being advised of his rights pursuant to *Miranda*,[2] Clary invoked his right to counsel and telephoned his father ("Clary Sr."), who is a lawyer. Clary Sr. used a second phone to call a criminal defense lawyer and put the two phones on speaker so Clary could consult with the other lawyer.

¶5 The State charged Clary by indictment with two counts of second degree murder, three counts of aggravated assault, and one count of leaving the scene of a fatal injury accident. All of the second degree murder and aggravated assault counts were alleged as dangerous offenses.

¶6 Before trial, Clary moved to dismiss the indictment with prejudice, arguing the State violated his rights to due process and counsel under the Fifth and Sixth Amendments when police officers "surreptitiously listened" to his telephone call with counsel at the substation. As evidence supporting his argument, Clary pointed to the following statements made by one detective to another at the station soon after Clary's consultation with counsel: "[Clary's] dad's a lawyer too. . . . That's why he said he couldn't hear good. He called his dad and his dad called the attorney and they were putting the phone . . . on speaker so they could . . . hear listen. . . . That's why he knew the number right away."[3] According to Clary, as a result of information police gleaned from the telephone call—ostensibly information regarding Clary's use of alcohol before the collision—Detective Siewert ("Siewert"), the State's case agent, obtained a search warrant to draw Clary's blood for alcohol testing. Clary argued that Siewert's affidavit supporting the search warrant falsely stated Siewert noticed signs of Clary's impairment because Siewert had only noticed such indications—including the strong odor of alcohol—*after* Clary's conversation with counsel.[4] Also, because Siewert testified to the grand jury regarding his perception of Clary's alcohol impairment, Clary

---

[2]     *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[3]     The detective who made this statement was unable to later explain how he knew about the logistics of the telephone call.

[4]     Siewert admitted at the hearing that, before Clary's telephone call, Siewert—and, presumably, all of the other law enforcement officers who interacted with Clary during his transport and at the substation—did not detect an odor of alcohol on Clary.

characterized this testimony as perjury and sought dismissal on this basis as well.

¶7 The trial court held an evidentiary hearing on the motion[5] and found that Clary had established a *prima facie* violation of his right to counsel—which the State failed to adequately rebut—and the State had not established that Clary was not prejudiced by the intrusion, "since evidence of alcohol use by [Clary] would be highly relevant to the homicide charge against him." As a remedy, rather than dismiss the indictment, the court suppressed evidence of Clary's alcohol use or impairment, including the blood draw test results[6] and Siewert's observation of impairment after Clary's conversation with counsel, reasoning that such evidence would be highly relevant to at least the homicide charges.[7]

¶8 The State moved to reconsider and to clarify the scope of evidence suppressed by the trial court's suppression order, and Clary moved to suppress items seized from the vehicles pursuant to search warrants, the affidavits for which contained the same purportedly false statement by Siewert regarding Clary's signs of impairment. At a subsequent pretrial hearing addressing those and other motions, Clary continued to argue the court "could have dismissed this case," but also stated the court's decision to suppress evidence of his alcohol use or impairment was "the appropriate remedy . . . to level that playing field." The court denied the State's motion to reconsider but granted the motion to clarify after noting, "The Court did not intend by its ruling to suppress evidence of alcohol use that preceded the attorney call (such as Officer Soller's[8] observations) or that was not obtained as a result of the intrusion

---

[5] Judge Robert E. Miles presided over the evidentiary hearing on Clary's motion to dismiss with prejudice, and issued the court's rulings on that motion and the subsequent pretrial motions by the parties.

[6] A retrograde analysis indicated Clary's blood alcohol concentration within two hours of the collision was between .082 and .146.

[7] Although the court's minute entry made clear the court did not believe at least a portion of the investigating detectives' testimony, including that of Siewert, the court did not expressly find the detectives had committed perjury.

[8] Lieutenant Soller was the officer who found and initially detained Clary in the residential neighborhood after the crash.

upon [Clary's] right to counsel." The court clarified that it was suppressing "any alcohol evidence that was obtained as a result of the intrusion, including the blood draw results and any testimony by Detective Siewert that he noticed indicia of alcohol use by [Clary] after the attorney call." (Emphasis deleted from original.) The court also denied Clary's motion to suppress items seized from the vehicles pursuant to the search warrants.[9]

¶9 At trial,[10] the State presented the testimony of Siewert, who also conducted the accident reconstruction in this case. Based on eyewitness reports and the physical evidence at the crash site, Siewert opined that Clary's Corvette was traveling a minimum speed of 122 to 124 miles per hour when it struck the Corsica as both vehicles were in the number five lane, causing the Corsica to spin clockwise before hitting the south wall of the freeway. Over Clary's objection, Siewert also referred to a crash data retrieval ("CDR") report he obtained from the Corvette's air bag control module ("ACM"), which indicated Clary accelerated from 131 to 142 miles per hour during the five seconds immediately before the collision. Siewert explained that, after striking the Corsica, the Corvette spun into the Jetta, causing the Jetta to also make contact with the freeway's south wall. In addition to the surviving victims' testimony, the State also presented testimony from numerous witnesses who saw and vividly described Clary's speeding moments before the collision and/or his fleeing from the scene.

¶10 The jury acquitted Clary of the two charged second degree murder counts, but found him guilty of the lesser-included offense of manslaughter on each count and found that each of these class two felonies was a dangerous offense. The jury also found Clary guilty as charged on the other counts. The court imposed a combination of concurrent and

---

[9] In addition, the court denied the State's motion pursuant to Rule 404(b), Ariz. R. Evid., to allow evidence of a previous incident involving Clary that occurred approximately one year before the collision in this case. The State alleged Clary had two misdemeanor convictions (for DUI and disorderly conduct) arising out of an incident in which Clary, while under the influence of alcohol, drove "over 120 miles per hour on the surface streets of Mesa," and after finally being stopped, fled from police on foot and fought the officers who sought to detain him.

[10] Judge Cynthia J. Bailey presided over the trial and sentencing in this matter.

consecutive terms of imprisonment totaling seventeen years, to be followed by five years of probation. This court has jurisdiction over Clary's timely appeal. *See* Ariz. Const. art. 6, § 9; Ariz. Rev. Stat. ("A.R.S.") §§ 12-120.21(A)(1), 13-4031, 13-4033(A).[11]

**ANALYSIS**

*I.      Grand Jury Testimony; Violation of Right to Counsel*

**¶11**          Clary contends suppression of the alcohol evidence was insufficient to cure the prejudice resulting from the violation of his right to counsel. He argues the trial court committed reversible error by not dismissing the indictment because it was based partially on Siewert's "perjured" testimony to the grand jury. Alternatively, Clary contends the trial court should have suppressed all evidence he maintains was obtained as a result of the violation.

**¶12**          In reviewing a trial court's ruling on a motion to dismiss the indictment or to suppress evidence, we generally defer to the court's factual findings and view the evidence presented at the suppression hearing and reasonable inferences therefrom in the light most favorable to sustaining the court's ruling, but we review *de novo* constitutional and legal issues. *See State v. Rosengren*, 199 Ariz. 112, 115-16, ¶ 9, 14 P.3d 303, 306-07 (App. 2000); *see also State v. Moody*, 208 Ariz. 424, 445, ¶ 62, 94 P.3d 1119, 1140 (2004); *State v. Walker*, 215 Ariz. 91, 94, ¶ 16, 158 P.3d 220, 223 (App. 2007). We review for an abuse of discretion the court's order suppressing the alcohol-related evidence as a remedy for the violation of Clary's rights. *See Rosengren*, 199 Ariz. at 116, ¶ 9, 14 P.3d at 307.

**¶13**          In determining whether dismissing an indictment is the appropriate remedy for the State's violation of a criminal defendant's right to counsel, a trial court weighs the defendant's constitutional rights against "society's interest in the administration of criminal justice." *State v. Pecard*, 196 Ariz. 371, 379, ¶ 38, 998 P.2d 453, 461 (App. 1999) (quoting *United States v. Morrision*, 449 U.S. 361, 364 (1981)). "Courts narrowly tailor remedies to Sixth Amendment violations to avoid unnecessarily infringing on this societal interest." *Id.* (citing *Morrison*, 449 U.S. at 364).

**¶14**          Generally, challenges to a grand jury's probable cause determination must be made before trial, and any challenge to the superior

---

[11]      We cite the current version of the statutes unless changes material to our decision have occurred since the date of the crimes.

court's ruling must be made by special action to this court. *Moody*, 208 Ariz. at 439-40, ¶ 31, 94 P.3d at 1134-35. However, this court will review an indictment on direct appeal "to determine whether it was based on perjured, material testimony." *Id.* at 440, ¶ 31, 94 P.3d at 1135. "A statement is material if it 'could have affected the course or outcome of [a] proceeding.'" *Id.* at ¶ 35 (quoting A.R.S. § 13-2701(1)).

**¶15** Here, the court was not required to dismiss the indictment based on Siewert's testimony to the grand jury regarding his purported observations of Clary's alcohol impairment because the State also presented overwhelming unchallenged testimony to the grand jury that sufficiently supports the indictment. For example, the grand jury heard testimony that witnesses observed Clary driving at a high rate of speed immediately before the collision; the Corsica sustained severe rear-end damage, and two of its occupants died; the surviving victims in the Corsica and the Jetta sustained physical injuries; the Corvette sustained severe front-end damage, and no brake marks were visible near the collision; and eyewitnesses observed Clary fleeing from the Corvette immediately after the collision. Notably, this evidence was presented at trial where the jury, without being provided any evidence of Clary's alcohol impairment, found beyond a reasonable doubt that Clary was guilty. Thus, Clary cannot establish that Siewert's testimony regarding Clary's apparent intoxication could reasonably have affected the proceeding's outcome. *See id.* at ¶¶ 34-36. Accordingly, the trial court did not abuse its discretion in ordering preclusion of alcohol-related evidence as a less drastic remedy than dismissing the indictment.[12] *Cf. Pecard*, 196 Ariz. at 380-81, ¶ 48, 998 P.2d at

---

[12] We similarly reject Clary's assertion, predicated on *United States v. Basurto*, 497 F.2d 781, 785-87 (9th Cir. 1974), that the prosecutor's failure to inform the grand jury of Siewert's apparently perjured testimony required the trial court to dismiss the indictment. *See United States v. Sager*, 227 F.3d 1138, 1149 (9th Cir. 2000) (recognizing that, to prevail on a *Basurto* claim, a defendant must prove actual government knowledge that grand jury testimony is perjurious); *United States v. Spillone*, 879 F.2d 514, 524 (9th Cir. 1989) (upholding an indictment despite claimed prosecutorial misconduct because a witness's alleged perjury did not "substantially influence the grand jury's decision to indict" or conflict with "fundamental fairness" (citations omitted)); *United States v. Claiborne*, 765 F.2d 784, 791 (9th Cir. 1985) ("[I]f sufficient non-perjurious testimony exists to support the indictment, the courts will not dismiss the indictment due to the presence of perjured testimony before the grand jury, on the assumption that the grand jury would have returned an indictment without the perjurious

462-63 (concluding the trial court abused its discretion in dismissing indictments without considering lesser remedies for a Sixth Amendment violation); *see also Morrison*, 449 U.S. at 365-66 ("[A]bsent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the [Sixth Amendment] violation may have been deliberate. This has been the result reached where a Fifth Amendment violation has occurred, and we have not suggested that searches and seizures contrary to the Fourth Amendment warrant dismissal of the indictment. The remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression." (footnotes omitted)); *State v. Penney*, 229 Ariz. 32, 36, ¶ 17, 270 P.3d 859, 863 (App. 2012) (recognizing in a DUI case that "suppression is the appropriate remedy when police interference with the right to counsel does not hamper the defendant's ability to gather exculpatory evidence" (citation omitted)).

**¶16**        Similarly, Clary has not shown the trial court erred in refusing to suppress all evidence Clary contends was obtained as a result of the violation of his right to counsel.[13]   This evidence, according to Clary,

---

evidence." (citation omitted)), *abrogated on other grounds by Ross v. Oklahoma*, 487 U.S. 81, 88 (1988). We also find no merit to Clary's argument that the State's actions independently required dismissal. As Clary notes, dismissal may be required upon proof the State learned about his "defense plans and strategy." *Pecard*, 196 Ariz. at 379-80, ¶ 43, 998 P.2d at 461-62. The trial court specifically found the extent of the State's benefit from the intrusion was that the State "obtain[ed] information leading to blood draw evidence," and Clary points to nothing in the record that indicates the State learned about his strategy for defending against the charges by listening to his conversation with counsel. *See generally Government Intrusion into Attorney-Client Relationship*, 42 Geo. L.J. Ann. Rev. Crim. P. 569-70 n.1705 (Betsy Henthorne et al. eds., 2013) ("The defendant bears the burden of proving a government intrusion into defense strategy and trial preparation." (citing cases)); *cf. United States v. Ofshe*, 817 F.2d 1508, 1515-16 (11th Cir. 1987) (concluding that no Sixth Amendment violation occurred despite infringement of the attorney-client privilege when a listening device was planted on defense counsel because no specific facts related to defense strategy were overheard and communicated to the prosecutor assigned to the case, and the defendant could show no prejudice).

[13]        In his reply brief, Clary relies on *Rosengren* to argue the State could not "avoid the effect of the police [Sixth Amendment] misconduct through the independent source or inevitable discovery doctrines." 199 Ariz. at 121,

includes paint chips, light bulbs, and personal effects from the vehicles involved in the collision; Clary's bank statements; a night club video; Clary's cell phone; the CDR report; and the DNA test results from the unlawfully obtained blood draw.[14]

¶ 30, 14 P.3d at 312. Even assuming without deciding that Clary has not waived this argument, we find *Rosengren* distinguishable. In that case, the trial court suppressed evidence of a defendant's blood test, HGN test, and refusal to voluntarily submit to a blood test, as well as certain observations and statements of the defendant after his arrival at a hospital based on a violation of the defendant's Sixth Amendment right to counsel. *Id.* at 115, ¶¶ 1, 7, 14 P.3d at 306. This court affirmed, concluding it was the *effect* of the denial of the right to counsel—an interference with the defendant's due process right to gather contemporary, independent exculpatory evidence of sobriety in a case in which actual impairment was the most critical factor in the recklessness element of the manslaughter charge against the defendant—that compelled the suppression. *Id.* at 121, ¶¶ 28-29, 14 P.3d at 312. In this case, the State was precluded from submitting any evidence of Clary's alcohol use or impairment, including the blood draw test results and Siewert's observation of impairment after Clary's conversation with counsel, and nothing shows the detectives' intrusion into Clary's Sixth Amendment right to counsel interfered with his right to gather evidence. Further, this case does not involve the "various and repeated infringements of [Clary's] rights" that occurred in *Rosengren*. *Id.* at 122, ¶ 32, 14 P.3d at 313. Moreover, this court has previously applied the independent source doctrine to allow the limited admission of evidence after a violation of a defendant's Sixth Amendment right to counsel, and has further recognized in that context that "the inevitable-discovery doctrine not only depends on the validity of the independent-source doctrine, it is derived from it." *See State v. Hackman*, 189 Ariz. 505, 508-10, 943 P.2d 865, 868-70 (App. 1997) (citations omitted). *Rosengren* discussed *Hackman* without disapproval. *See* 199 Ariz. at 116, 119-20, ¶¶ 9, 22-23, 14 P.3d at 307, 310-11.

[14]     At trial, the State presented evidence that Clary's DNA from the blood sample collected by Siewert matched the DNA found on the Corvette's deployed driver-side air bag. Clary suggests in a footnote that the trial court erred in denying his motion to preclude the DNA evidence on the basis of late disclosure. Our review of the record reveals no abuse of the trial court's discretion in this matter. *See, e.g., State v. Delgado*, 174 Ariz. 252, 257-60, 848 P.2d 337, 342-45 (App. 1993) (recognizing that "preclusion

¶17          Clary does not cite to the record where the items were used at trial, and our review of the record reveals that at least the video and Clary's bank statements were not introduced into evidence. The DNA evidence, which was admitted at trial, was proper under the inevitable discovery doctrine. Siewert testified at the hearing on the motion to dismiss that, even if alcohol was not a factor in this case, because the Corvette's driver was not at the crime scene, Siewert would have collected a DNA sample from Clary in an effort to determine if that sample matched up to evidence on "the airbag or something of that manner." *See State v. Rojers*, 216 Ariz. 555, 559, ¶ 18, 169 P.3d 651, 655 (App. 2007) ("The inevitable discovery doctrine, which is an exception to the exclusionary rule, provides that illegally obtained evidence is admissible [i]f the prosecution can establish by a preponderance of the evidence that the illegally seized items or information would have inevitably been seized by lawful means." (internal quotation marks and citations omitted)); Ariz. R. Crim. P. 15.2(a)(6) (requiring a criminal defendant to provide samples of bodily materials upon the prosecutor's written request); *see also Hackman*, 189 Ariz. at 508-10, 943 P.2d at 868-70; *cf. Moody*, 208 Ariz. at 446, ¶ 67, 94 P.3d at 1141 ("Even if this court were to conclude that Moody's right to consult counsel under Rule 6.1(a) was violated as to the other evidence, [] Moody fails to demonstrate that suppression would be required. Federal jurisprudence is clear that if evidence could have been obtained despite the violation of right to counsel, there is no reason to keep that evidence from the jury." (citation omitted)). As for the remaining items Clary challenges, after excising the affidavits' references to indicia of Clary's intoxication, the remaining information is sufficient to establish probable cause. *See State v. Poland*, 132 Ariz. 269, 279, 645 P.2d 784, 794 (1982) (stating that, after excising the false statement from a search warrant affidavit, the "remaining content must be sufficient to establish probable cause" (citation omitted)). Accordingly, the trial court did not err in ruling the evidence admissible.[15]

---

is rarely an appropriate sanction for a discovery violation" (citation omitted)).

[15]          At trial, Lieutenant Soller (the officer who first encountered Clary after the collision) testified that Clary initially claimed to live in the neighborhood where he had been hiding, but when the officer asked Clary his address, Clary responded he "had a party last night." Clary suggests the court erred in allowing the prosecutor to elicit this testimony and reference it in closing argument. Clary first raised this issue at trial three weeks after the officer's testimony, asking the court to preclude the

*II.     Admission of ACM/CDR Evidence; Siewert's Expert Testimony*

**¶18**        Clary argues the trial court erred in admitting Siewert's testimony concerning the CDR report's conclusion regarding the Corvette's speed moments before the collision.  Specifically, Clary contends that the report constitutes inadmissible hearsay and that Siewert's testimony violated Clary's Sixth Amendment right to confrontation.  Clary also contends the CDR evidence lacked proper foundation under Arizona Rule of Evidence 702 and was inadmissible under Rule 703, Ariz. R. Evid.

**¶19**        We generally review a trial court's ruling on the admissibility of evidence for an abuse of discretion.  *State v. King*, 213 Ariz. 632, 636, ¶ 15, 146 P.3d 1274, 1278 (App. 2006).  However, we review *de novo* challenges to admissibility based on the Confrontation Clause.  *Id.*  "[T]he Confrontation Clause prohibits the admission of testimonial evidence from a declarant who does not appear at trial unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant."  *Id.* at 637, ¶ 17, 146 P.3d at 1279 (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)).

**¶20**        The CDR report is a computer-generated compilation of objective data, including the Corvette's speed, braking, throttle percentage, and air bag deployment status.  Siewert used the CDR report to "check" his own conclusion that the Corvette was travelling 122 to 124 miles per hour

---

prosecutor from referencing the statement during closing argument.  The court denied Clary's request after noting Clary did not object during the testimony, and reasoning that Clary's comment of having a "party" was probative of "the fact that he didn't live in the neighborhood" where he was apprehended.  The court also concluded the probative value of this statement outweighed any unfair prejudice.  *See* Ariz. R. Evid. 403.  Clary fails to develop any argument sufficient for appellate review regarding this issue, and has therefore waived his apparent claim that this ruling violated Rule 403.  *See State v. Bolton*, 182 Ariz. 290, 298, 896 P.2d 830, 838 (1995) (citing *State v. Carver*, 160 Ariz. 167, 175, 771 P.2d 1382, 1390 (1989); Ariz. R. Crim. P. 31.13(c)(1)).  Moreover, even assuming *arguendo* Clary has not waived this claim, the trial court did not abuse its discretion.  *See generally State v. Chappell*, 225 Ariz. 229, 238, ¶ 28, 236 P.3d 1176, 1185 (2010) (recognizing that, in general, evidentiary rulings are reviewed for an abuse of discretion and the reviewing court defers to the trial court's determination of relevance).

when it collided with the Corsica. The court did not admit the CDR report itself; instead, only Siewert's independent expert testimony was admitted. Siewert's testimony about the CDR report was therefore not admitted to prove Clary's speed was 142 miles per hour. Accordingly, the evidence was not hearsay.[16] Furthermore, Clary cross-examined Siewert for over three days, spending a significant amount of time on the ACM/CDR data and report, and eliciting Siewert's testimony that he had done his own independent evaluation and used the CDR report only as an aid in evaluating his results. Under these circumstances, there was no Confrontation Clause violation. *See State ex rel. Montgomery v. Karp*, 236 Ariz. 120, 124-25, ¶¶ 14-15, 19, 336 P.3d 753, 757-58 (App. 2014) (concluding the Confrontation Clause is satisfied when an expert testifies about objective computer-generated data to illustrate the basis of her opinion, and she is subject to cross-examination); *cf. State v. Pesqueira*, 235 Ariz. 470, 475-76, ¶¶ 15-19, 333 P.3d 797, 802-03 (App. 2014) (holding that a medical examiner's opinion testimony based largely on an autopsy report not admitted into evidence and prepared from an autopsy performed by a non-testifying expert did not violate the Confrontation Clause because the report was not used to prove the truth of its contents but to show the basis for the medical examiner's opinion, and the testifying witness—the medical examiner—was subject to cross-examination).[17]

---

[16]     Also, as a "limiting instruction," the court instructed the jury to only consider the ACM/CDR data as a basis for Siewert's collision reconstruction opinions, not as substantive evidence of the information contained in the report. We presume the jury followed the court's instructions. *See State v. McCurdy*, 216 Ariz. 567, 574, ¶ 17, 169 P.3d 931, 938 (App. 2007).

[17]     Without fully developing the argument, Clary also asserts in a footnote that the trial court violated his right to confrontation by denying his request to ask a follow-up question of a detective after the State followed up a juror question regarding gouge marks. Because Clary did not assert this specific claim in the trial court, Clary has the burden to show error occurred, the error was fundamental, and he was prejudiced thereby. *See State v. Henderson*, 210 Ariz. 561, 567-69, ¶¶ 19-26, 115 P.3d 601, 607-09 (2005). In this case, Clary has not demonstrated that fundamental error occurred, and even if we were to assume *arguendo* that such error occurred, Clary has shown no prejudice. At trial, Clary cross-examined the detective at length about his gouge mark measurements, and declined the court's invitation to ask follow-up questions after the detective responded to the

**¶21** Siewert's testimony regarding the CDR report was also properly admissible under Rules 702 and 703. Rule 702 states as follows:

> A witness *who is qualified as an expert by knowledge, skill, experience, training, or education* may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) *the testimony is the product of reliable principles and methods*; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Ariz. R. Evid. 702 (emphasis added).

**¶22** With regard to Rule 702, Clary challenges Siewert's qualifications as an expert accident reconstructionist and the reliability of his testimony regarding the CDR data.[18] Despite Clary's arguments to the

juror's question by stating that, to his knowledge, no other accidents that could have caused the gouge marks had occurred at that location and within the relevant time frame. Next, in response to the prosecutor's follow-up question, the detective explained that, to determine which marks may have been from prior accidents, he would walk through the scene and observe "the dynamics of what has taken place." Clary then sought to ask a further follow-up question, explaining, "I simply want to ask him if he did all of that in this case, and then he put it [in] this diagram, did he put it in his report." The court's denial of Clary's request did not rise to the level of fundamental error or cause him prejudice. *Cf. State v. Lehr*, 201 Ariz. 509, 518, ¶ 30, 38 P.3d 1172, 1181 (2002) ("Judges, in their discretion, may place reasonable limits upon the scope of cross-examination, without infringing upon the defendant's right of confrontation." (citation omitted)), *supplemented by* 205 Ariz. 107, 67 P.3d 703 (2003).

[18] Clary summarily asserts that Siewert's reconstruction methodologies independent of the CDR data "were flawed and unreliable." Clary cites no authority supporting his arguments, however, and in any

contrary—including Siewert's lack of certification by the Accreditation Commission for Traffic Accident Reconstruction ("ACTAR")—Siewert is a qualified accident reconstructionist. The record reflects that at the time of trial, Siewert had investigated more than 750 vehicle collisions, had been the primary investigator for twenty-four of those investigations, and had accrued almost 2,000 hours of "collision training." Siewert also testified he is a member of various professional organizations, and membership in ACTAR is not required to be an accident reconstructionist.[19] Siewert is clearly qualified by his experience and training to assist the jury in understanding the circumstances of the vehicle collision in this case. *See McMurtry v. Weatherford Hotel, Inc.*, 231 Ariz. 244, 251-52, ¶¶ 16-18, 293 P.3d 520, 527-28 (App. 2013) (holding that a witness qualified as an expert based on his experience). Any perceived defects in Siewert's qualifications go to the weight, not the admissibility, of his opinion testimony. *See State v. Delgado*, 232 Ariz. 182, 186, ¶ 12, 303 P.3d 76, 80 (App. 2013).

**¶23** Regarding the reliability of Siewert's CDR data testimony, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court established the following non-exclusive set of factors to assist courts when evaluating an expert's reliability:

> (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique or theory is generally accepted within the relevant scientific community; (4) the known or potential rate of error of the technique or theory when applied; and (5) the existence and maintenance of standards controlling application of the technique.

*State ex rel. Montgomery v. Miller*, 234 Ariz. 289, 299, ¶ 24, 321 P.3d 454, 464 (App. 2014) (citing *Daubert*, 509 U.S. at 593-94). "No single *Daubert* factor is dispositive of the reliability of an expert's testimony, and not all of the

---

event, his arguments go to the weight of this evidence, not its admissibility. *See, e.g., State v. Van Adams*, 194 Ariz. 408, 418-19, ¶ 34, 984 P.2d 16, 26-27 (1999).

[19] Siewert explained that ACTAR "is a written test put on by a private company" and he "would get nothing in [his] current career field" by joining ACTAR.

*Daubert* factors will apply to 'all experts or in every case.'" *Id.* at ¶ 25 (citations omitted).

**¶24** Here, application of the relevant *Daubert* factors indicates Siewert's testimony regarding the CDR data was reliable. Siewert testified both at the evidentiary hearing and at trial that the known error rates associated with CDR data had been tested, that his reconstruction opinions were subject to peer and supervisor review, and that the error rates were approximately plus or minus four miles per hour for speed and ten miles per hour for a change in velocity. In addition, other courts have expressly determined that downloading CDR technology is generally accepted in accident reconstructions. *See, e.g., Commonwealth v. Safka*, 95 A.3d 304, 308 (Pa. Super. Ct. 2014) ("[T]he technology has existed for almost 40 years, has been adopted by the major automobile manufacturers, and has been recognized as an acceptable tool used by accident reconstruction experts to determine a vehicle's speed prior to an impact. It is not novel science; it is an accepted technology."), *aff'd*, ___A.3d ___, 2016 WL 3908191 (July 19, 2016); *Bachman v. Gen. Motors Corp.*, 776 N.E.2d 262, 281 (Ill. App. Ct. 2002) ("[T]he process of recording and downloading SDM data does not appear to constitute a novel technique or method." (citation omitted)). Finally, Siewert testified he was trained and certified by the Collision Safety Institute to download and analyze CDR data, indicating standards exist to control how such data should be used by accident reconstructionists. Therefore, the trial court did not abuse its discretion in finding that Siewert's testimony regarding the CDR report comported with Rule 702.

**¶25** Clary also argues Siewert's testimony regarding the CDR report was inadmissible under Rule 703[20] because Siewert did not rely on the data downloaded from the Corvette in forming his opinions regarding the collision. The record reflects that Siewert relied on the CDR report as protocol required to confirm the accuracy of his independent reconstruction opinions; however, he testified the "report in and of itself is not used solely on its own." The trial court acted within its discretion in finding Siewert's CDR report testimony admissible on this basis. Further, the trial court did

---

[20] In relevant part, Rule 703 provides: "If experts in the particular field would reasonably rely on . . . facts or data in forming an opinion on the subject, [the facts or data] need not be admissible for the opinion to be admitted." Ariz. R. Evid. 703.

not abuse its discretion in admitting Siewert's testimony under any rule of evidence cited by Clary.[21]

### III.  Alleged Prosecutorial Misconduct

**¶26**       Clary asserts several instances of prosecutorial misconduct during closing arguments require reversal.  We separately address each of Clary's assertions.

**¶27**       "To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that '(1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying [the] defendant a fair trial.'"  *Moody*, 208 Ariz. at 459, ¶ 145, 94 P.3d at 1154 (citation omitted).  Prosecutorial misconduct is not merely "legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole, amounts to intentional conduct which the prosecutor knows to be improper and prejudicial."  *Pool v. Superior Court*, 139 Ariz. 98, 108, 677 P.2d 261, 271 (1984) (footnote omitted).  To justify reversal, the misconduct "must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'"  *State v. Lee*, 189 Ariz. 608, 616, 944 P.2d 1222, 1230 (1997) (citations omitted).  Even then, as noted, reversal is not required unless the defendant was denied a fair trial.  *State v. Bible*, 175 Ariz. 549, 600, 858 P.2d 1152, 1203 (1993).

### A.  Alleged Comment on Silence/Burden of Proof

**¶28**       Clary argues the State improperly commented on his decision not to testify and shifted the burden of proof when the prosecutor argued, "There has been no evidence presented by anyone that goes against Detective Siewert's reconstruction."  This comment, however, merely pointed out that no evidence supported the defense theory that a vehicle other than the Corvette caused the collision; it did not refer to Clary's decision to exercise his Fifth Amendment privilege not to testify.  The prosecutor's statement did not shift the burden of proof or constitute improper comment on Clary's right to remain silent, and was not otherwise

---

[21]       Clary also suggests Siewert violated his due process rights by apparently failing to preserve one coefficient of friction (skid) test.  Clary was able to fully cross-examine Siewert as to this issue and has established no basis for relief.  *See State v. Forde*, 233 Ariz. 543, 559, ¶ 46, 315 P.3d 1200, 1216 (2014).  Further, Clary points to nothing improper about Siewert's decision to destroy his notes after incorporating them into a police report.  *See State v. Axley*, 132 Ariz. 383, 393, 646 P.2d 268, 278 (1982).

improper. *See State v. Martinez*, 130 Ariz. 80, 82, 634 P.2d 7, 9 (App. 1981) (concluding that statements by a prosecutor, when considered in context, were fair rebuttal to an unsupported defense theory, and noting that generally, a prosecutor's comment on a defendant's failure to present evidence is objectionable only "if such reference is calculated or intended to direct the jury's attention to the fact that a defendant has chosen to exercise his fifth amendment privilege" (citations omitted)); *see also State v. Sarullo*, 219 Ariz. 431, 437, ¶ 24, 199 P.3d 686, 692 (App. 2008) (holding that the prosecutor's comment regarding the defendant's failure to present expert evidence to support the defense theory was not prosecutorial misconduct). No misconduct occurred on this basis.

### B. Alleged Improper "Testifying"

**¶29** Clary claims the prosecutor improperly "testified" to facts not in evidence based on three instances. First, Clary points to the prosecutor's statement that Siewert "determined no one else in this collision but the Corvette caused the collision." This is a proper comment on the evidence and does not amount to improper testifying as Clary asserts. Siewert testified to the Corvette's excessive speed and the Corsica's and Jetta's significantly relative lower speeds and the fact that the vehicles were established in their lanes at the time of the collision. Further, eyewitnesses saw Clary flee from the Corvette immediately after the collision. *See State v. Cota*, 229 Ariz. 136, 142, ¶ 11, 272 P.3d 1027, 1033 (2012) ("Evidence of flight is admissible to show consciousness of guilt when the defendant flees 'in a manner which obviously invites suspicion or announces guilt.'" (citation omitted)). Because counsel may argue reasonable inferences and suggest ultimate conclusions from the evidence, no misconduct occurred. *See Bible*, 175 Ariz. at 602, 858 P.2d at 1205.

**¶30** Second, Clary argues the prosecutor falsely stated that when the Corvette sped past a husband and wife driving home, both the husband who testified and the passenger-wife were "startled." We agree the record reflects the wife did not testify at trial, and the husband did not explicitly testify the Corvette startled his wife. The husband did testify, however, that when the Corvette passed the couple "at a high rate of speed," their car "was shaking and rattling pretty good," and the husband "was scared because [the Corvette] had just barely passed us" and he had never previously seen a car go that fast on the freeway. The husband agreed the Corvette "startle[d]" him and that it "made a lot of noise" as it passed. At least three other occupants of vehicles testified they were frightened, startled, or "freaked out" when the speeding Corvette passed them. Thus, the prosecutor's statement that the passing Corvette "[s]tartled [the

husband] and his wife" was overwhelmingly supported by inference, and even if not, Clary has not shown the statement rose to the level of misconduct—rather than an inadvertent mistake—that likely affected the verdict and denied him a fair trial.

**¶31** Third, Clary challenges the prosecutor's reference to two responding officers' testimony that the Corsica "was so crushed seatbelts wouldn't have helped" the occupants who were killed. According to Clary, this statement constituted misconduct because neither officer testified about seat belts, and the court had precluded seat belt evidence.[22] Clary is correct that the responding officers did not testify about the Corsica occupants' seat belt use. The officers did testify, however, that the Corsica was so severely crushed that the driver and back-seat passenger were "pinned" and "stuck" in the vehicle. Further, Clary elicited testimony from Siewert regarding information from the Corsica's front-seat passenger indicating the back-seat occupant was not wearing a seat belt. In light of the deceased victims' physical positions in the crushed Corsica, and the evidence that the back-seat passenger was not wearing a seat belt, the prosecutor could reasonably respond to the apparent defense theory and argue that properly worn seat belts would not have saved the victims' lives. And the prosecutor's erroneous attribution of the seat belt comment to the officers' testimony did not rise to the level of misconduct; indeed, read in context, the focus of the prosecutor's argument was not on the use of seat belts, but the severity of the Corsica's damage:

> Officer Williams and Officer McClellan described the door of the Corsica of course and they talked about how the vehicle was so crushed seatbelts wouldn't have helped these people. Airbags wouldn't have helped them. That vehicle is an accordion. Crushed. A four door car crushed to a two door car. Officer Williams stated that there was so much damage he could not even find a license plate much less figure out what the license plate number was. They described [the driver of the Corsica] as being pinned between that seat and that steering wheel.

The prosecutor did not commit misconduct through this argument.

---

[22] The portion of the record Clary references indicates the trial court sustained objections to jury questions regarding whether the victims were wearing seat belts at the time of the collision.

### C.    Alleged Vouching

¶32    Clary contends the prosecutor impermissibly engaged in vouching by "plac[ing] the prestige of the government behind its witness." *State v. King*, 180 Ariz. 268, 276, 883 P.2d 1024, 1032 (1994) (citation omitted). This "type of vouching involves personal assurances of a witness's veracity." *Id.* at 277, 883 P.2d at 1033 (citation omitted).

¶33    As part of his vouching argument, Clary challenges the prosecutor's comment that Siewert "knows his stuff." This statement did not constitute improper vouching, but was a reasonable inference and proper reference to Siewert's testimony explaining his knowledge and experience in accident reconstructions. Clary next contends the prosecutor vouched and improperly testified that "[v]ery few officers are members of ACTAR." This statement is a reasonable inference from Siewert's testimony that no one in his Vehicular Crimes Unit is a member of ACTAR. Clary also argues the prosecutor vouched for Siewert's opinions and improperly referred to the CDR report as substantive evidence of the Corvette's speed by stating, "That information showed the Defendant going in the area of 131 to 142. An increased throttle and no brakes which all confirmed his reconstruction of 122 to 124." Clary, however, ignores the prosecutor's immediately preceding statements: "Now, [Siewert] used the CDR to download the airbag control module data and used that data to confirm his work. Didn't use it in his primary investigation but he used it to confirm his work." Considering this context, the prosecutor did not vouch for Siewert's reconstruction opinions, and she made clear the CDR report was used merely to confirm Siewert's opinions, not as substantive evidence of speed.

### D.    Other Alleged Prosecutorial Misconduct

¶34    Clary argues the prosecutor improperly appealed to the passions and fears of the jury by stating Clary was driving "no less than 122 to 124 miles per hour with everyday people out on that road. Friends, loved ones, normal everyday people." This statement was not improper. *See State v. Jones*, 197 Ariz. 290, 307, ¶ 43, 4 P.3d 345, 362 (2000) (concluding that the prosecutor's remark asking the jury to find the defendant "guilty on behalf of those people and their families and the people of the State of Arizona" was not an attempt to inflame the jury and did not rise to the level of misconduct). "[E]xcessive and emotional language is the bread and butter weapon of counsel's forensic arsenal, limited by the principle that attorneys are not permitted to introduce or comment upon evidence which has not

previously been offered and placed before the jury." *Id.* at 305, ¶ 37, 4 P.3d at 360 (citation omitted).

**¶35** Next, Clary contends the prosecutor falsely claimed the parties stipulated to reckless conduct and to Clary's involvement in the accident, when in fact Clary only stipulated to the victims' injuries. The cited portion of the record, however, does not support Clary's contention:

> Mark Clary, Jr., recklessly engaged in conduct which created a grave risk of death. Now you've heard our stipulation. We agree that two people died here. Aggravated assault. Using a dangerous instrument Mark Clary, Jr., recklessly caused physical injury to another. Again, we have agreed three people were injured in this case.

The prosecutor properly referred to the scope of the stipulations.

**¶36** Finally, Clary contends the prosecutor committed misconduct by allowing a trial witness who had yet to testify to remain in the courtroom and observe a portion of another witness's testimony, in violation of the exclusionary rule. *See* Ariz. R. Crim. P. 9.3(a). The record, however, reflects the prospective witness misunderstood the prosecutor's admonishment to not enter the courtroom until called to testify. The trial court, after hearing the prosecutor's avowals that she instructed the prospective witness to remain outside the courtroom, found no intentional violation of the exclusionary rule and reasoned that any possible prejudice to Clary could be remedied by cross-examination. We defer to the trial court's credibility finding. *See, e.g., Wainwright v. Witt*, 469 U.S. 412, 428 (1985) (noting that "determinations of demeanor and credibility [] are peculiarly within a trial judge's province [and are] entitled to deference even on direct review"). Again, Clary has shown no misconduct on the part of the prosecutor.

**¶37** We conclude none of the examples Clary raises amount to prosecutorial misconduct individually. Accordingly, we reject as a factual matter his argument that they cumulatively denied him a fair trial.

> *IV. Eyewitness Testimony Regarding Fault and Speed*

**¶38** Clary raises two issues in connection with the trial testimony of witnesses travelling on the freeway who either observed the Corvette's excessive speed shortly before the collision or saw him flee the crime scene.

**¶39** Before trial, Clary moved to preclude witnesses from testifying about fault and providing "a specific mile-per-hour estimate" of

the Corvette's speed, although he acknowledged he did not "have a problem with a lay witness saying that we [sic] felt like the vehicle was going fast or extremely fast" because "those are the kinds of things a lay person can say." The court granted the motion in part and precluded lay witness testimony regarding specific miles per hour. The court ruled, however, that witnesses could testify in general terms about the Corvette's speed. Regarding Clary's request to preclude testimony regarding fault, the court warned the prosecutor to instruct the State's witnesses to not "speculate or guess," but the court otherwise did not make an express ruling except to advise counsel that if an inadvertent "error answer" from a witness occurred, counsel could make the appropriate objections at trial, and upon sustaining the objection, the court would strike the testimony and instruct the jury as appropriate.

¶40        Clary argues that, notwithstanding these pretrial orders, three witnesses improperly testified about his fault on direct examination. The first witness, in referring to the Corvette, responded to the prosecutor's questioning as follows:

> Q:  But, you said it went really fast past you?
>
> A:  Yes.
>
> Q:  Did it frighten you?
>
> A:  Yes.
>
> Q:  Why did it frighten you?
>
> A: Because first I didn't see it coming at all and when it blew past me my very first thought was, *my God he's going to kill somebody*.

(Emphasis added.) The second witness testified that, after she observed the Corvette in her rearview mirror "going really really fast," she exclaimed, "*[F] - - - ers like that is what causes accidents*." (Emphasis added.) The third witness observed the collision occur behind him while he was driving. After pulling over, the witness got out of his vehicle and ran after Clary, who was fleeing the scene of the collision. The witness began yelling profanities at Clary and at trial explained, "*I was just mad, knowing – seeing someone causing something like that* and running away." (Emphasis added.)

¶41        Clary contends the foregoing emphasized language is improper testimony regarding fault. Because he did not object to this

21

testimony at trial, however, we conduct a fundamental error review. *See Henderson*, 210 Ariz. at 567, ¶ 19, 115 P.3d at 607. As we have previously noted, to obtain relief under fundamental error review, Clary has the burden to show error occurred, the error was fundamental, and he was prejudiced thereby. *See id.* at 567-69, ¶¶ 19-26, 115 P.3d at 607-09. Fundamental error is error that "goes to the foundation of his case, takes away a right that is essential to his defense, and is of such magnitude that he could not have received a fair trial." *Id.* at 568, ¶ 24, 115 P.3d at 608 (citation omitted).

**¶42**　　　In this case, Clary has shown no error. *See State v. Lavers*, 168 Ariz. 376, 385, 814 P.2d 333, 342 (1991) (recognizing that, before a reviewing court may engage in fundamental error analysis, it must first find the trial court committed some error). Clary has not cited any authority that would require the trial court to *sua sponte* strike the challenged testimony, especially considering the court's pretrial direction that Clary make appropriate objections at trial.[23] Further, even if Clary could establish error that was fundamental, he has not met his burden of proving prejudice in light of the overwhelming evidence of his guilt. Such evidence includes multiple eyewitness accounts of the Corvette's extreme speed and aggressive driving, Clary's fleeing the scene, and Clary's attempts to avoid apprehension by hiding for approximately two to three hours, lying to the apprehending police officer about living in the area, and attempting to hide his driver's license from that officer.

**¶43**　　　Clary next argues the court erred in precluding him from impeaching an eyewitness with her prior sworn statement that the Corvette passed her vehicle going "10 miles faster than us at least or more." Clary contends the court's ruling deprived him of his right to full and fair cross-examination, his right to confront the witness, and his right to present a complete defense.

---

[23]　　Clary also cursorily and insufficiently argues the court's failure to act violated "numerous Rules of Evidence" and his right to a fair trial. Absent authority and a developed argument, we decline to further address this argument. *See Moody*, 208 Ariz. at 452 n.9, ¶ 101, 94 P.3d at 1147 n.9 ("In Arizona, opening briefs must present significant arguments, supported by authority, setting forth an appellant's position on the issues raised." (citation omitted)); *State v. Sanchez*, 200 Ariz. 163, 166, ¶ 8, 24 P.3d 610, 613 (App. 2001) (concluding an issue was waived because the appellant failed to develop an argument in his brief).

¶44 The court did not abuse its discretion in precluding this cross-examination, however, because the prior statement is not inconsistent with the witness's trial testimony describing the Corvette as going "[r]eally fast" and "way faster than us," and denying having ever previously seen a car go that fast on the freeway. As such, the prior statement was hearsay and inadmissible. *See* Ariz. R. Evid. 801(d)(1)(A) (providing that a prior statement made by a testifying declarant who is subject to cross-examination is not hearsay if it is inconsistent with the declarant's trial testimony); Ariz. R. Crim. P. 19.3(b) ("No prior statement of a witness may be admitted for the purpose of impeachment unless it varies materially from the witness' testimony at trial."); *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (recognizing that "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions," including the application of reasonable evidentiary rules (citations omitted)); *see also State v. Caldwell*, 117 Ariz. 464, 473, 573 P.2d 864, 873 (1977) (recognizing that the "preliminary requirement" for admitting impeachment evidence is "that there be testimony inconsistent with prior statements"); *State v. Navallez*, 131 Ariz. 172, 174, 639 P.2d 362, 364 (App. 1981) (recognizing "the long established rule that in order for a prior statement to be admitted for impeachment it must directly, substantially, and materially contradict testimony in issue" (citations omitted)).

V. *Admission of Allegedly Prejudicial Evidence*

A. *Accident Scene Photographs*

¶45 Clary argues the court erred in admitting photographs depicting the crushed Corsica and the deceased victim's arm hanging out of the vehicle—with the remainder of the victim's body covered by a blue sheet. Clary contends the photographs were irrelevant and were admitted solely to prejudice the jury.

¶46 Trial judges have broad discretion in deciding whether to admit photographic evidence. *State v. Bocharski*, 200 Ariz. 50, 56, ¶ 27, 22 P.3d 43, 49 (2001). In determining whether to admit such evidence, the court first considers whether it is relevant, i.e., whether it aids the jury's understanding of any material issue in dispute. *State v. Amaya-Ruiz*, 166 Ariz. 152, 170, 800 P.2d 1260, 1278 (1990). The court next considers "whether the photographs would tend to incite passion or inflame the jury. In the event that they are inflammatory, the court balances their probative value against their potential to cause unfair prejudice." *Id.*

¶47 In this case, the photographs were relevant to show the degree of damage to the Corsica, which in turn is relevant to determine the Corvette's speed at the time of the collision and whether Clary drove recklessly. The photographs also corroborate testimony regarding the damaged Corsica and the resulting death of two of its occupants. *See State v. Morris*, 215 Ariz. 324, 339, ¶ 70, 160 P.3d 203, 218 (2007) (noting that photographs of a victim may be introduced to, among other things, corroborate, illustrate, or explain testimony).[24]

¶48 Further, Clary has not shown the photographs are so gruesome that their probative value is outweighed by the danger of unfair prejudice under Rule 403. *See, e.g., State v. Castaneda*, 150 Ariz. 382, 391, 724 P.2d 1, 10 (1986) (holding that photographs of stab wounds in the victim's chest and the victim's nude body smeared with blood were properly admitted); *State v. Poland*, 144 Ariz. 388, 401, 698 P.2d 183, 196 (1985) (holding that a photograph of a victim's fully clothed body lying face down was not gruesome, and a close-up photograph of a victim's torso and decomposed head, although gruesome, was properly admitted because the probative value outweighed the prejudicial effect). The court did not abuse its discretion in admitting the photographs.

*B. Witnesses' 9-1-1 Calls*

¶49 Clary also challenges the trial court's determination that recordings of trial witnesses' 9-1-1 calls were admissible. Clary contends statements made on the recordings are irrelevant, unfairly prejudicial, constitute improper opinion testimony by lay witnesses, and are hearsay. *See generally* Ariz. R. Evid. 401-03, 701, 801-02. The specific statements Clary finds objectionable include: (1) "The guy was going way too F'ing fast."; (2) "It's that guy's fault."; (3) "Oh my God!"; (4) "Does he have a pulse?"; and (5) a statement that the Corvette was going well over 100 miles per hour.

¶50 Clary has shown no error. As the trial court concluded, the statements are relevant as to the charged offenses, and although some of

---

[24] Moreover, even if a defendant does not contest certain issues, photographs may still be admissible if relevant because the State's "burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense." *State v. Dickens*, 187 Ariz. 1, 18, 926 P.2d 468, 485 (1996) (quoting *Estelle v. McGuire*, 502 U.S. 62, 69 (1991)), *abrogated on other grounds by State v. Ferrero*, 229 Ariz. 239, 274 P.3d 509 (2012).

the statements are emotionally charged, they are not unduly prejudicial considering the callers are viewing the scene of a serious fatal vehicle collision. As present sense impressions and excited utterances, the statements are not excluded by the rule against hearsay. *See* Ariz. R. Evid. 803(1)-(2). With one exception discussed below, the statements are not lay opinions; thus, Rule 701 is not implicated.

¶51 The one statement on the 9-1-1 recordings that may constitute a lay opinion is: "It's that guy's fault." But lay witnesses are permitted to give opinion testimony as to an ultimate issue as long as the opinion comports with Rule 701. *See State v. Doerr*, 193 Ariz. 56, 63, ¶ 26, 969 P.2d 1168, 1175 (1998). Rule 701 states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Ariz. R. Evid. 701.

¶52 Here, the witness who made the fault statement testified as follows regarding the Corvette:

> So I got over and just as I got over that's when I looked up in the rearview mirror and saw that there was a vehicle coming excessively fast. So, I thought I should probably get back over. So I got back over and the vehicle passed me just as I got over and then the vehicle cut me off, got over to the left lane sped up and then he, as he was getting over -- let me go back. He passed me, cut me off. As he cut me off he almost rear-ended an SUV so he got over, sped up, got back over and then that's when the collision happened.

¶53 The fault statement during the 9-1-1 call was rationally based on the caller's perception as a driver who had recently encountered the speeding Corvette moments before and during the collision. The statement was also clearly helpful to determining Clary's fault, and it was not based

on scientific, technical, or other specialized knowledge. The court did not abuse its discretion in ruling the 9-1-1 call recordings admissible.

*VI.    Sentencing Minute Entry*

**¶54**        The parties agree that the trial court's September 13, 2013 sentencing minute entry improperly references A.R.S. §§ 13-710 and 13-705 for Clary's manslaughter convictions (Counts 1 and 2). Because Clary was not convicted of second degree murder, the reference to A.R.S. § 13-710 must be deleted. Further, the victims in this case were not children or minors, and Clary was not charged with, or convicted of, dangerous crimes against children. Consequently, the reference to A.R.S. § 13-705 must also be deleted. Pursuant to A.R.S. § 13-4036, we modify the trial court's September 13, 2013 sentencing minute entry to reflect that the references to A.R.S. §§ 13-710 and 13-705 are deleted from Counts 1 and 2. *See State v. Ochoa*, 189 Ariz. 454, 462, 943 P.2d 814, 822 (App. 1997).

**¶55**        Although not noted by the parties, the sentencing minute entry also states Clary's sentences for the aggravated assault counts (Counts 3, 4, and 5) are "aggravated." Both the length of the sentences and the transcript of the sentencing hearing make clear, however, that the court sentenced Appellant to mitigated terms of imprisonment for those counts, each of which was a class three dangerous felony. Accordingly, pursuant to A.R.S. § 13-4036, we also modify the sentencing minute entry to reflect that Clary's sentences for Counts 3, 4, and 5 are "mitigated," not "aggravated." *See Ochoa*, 189 Ariz. at 462, 943 P.2d at 822.[25]

---

[25]        Clary also argues the trial court "improperly considered evidence of alcohol/impairment during sentencing." Before sentencing, however, the court granted Clary's motion to preclude consideration of any aggravating factors. Further, in imposing substantially mitigated sentences for the manslaughter and aggravated assault counts, the court made no mention of alcohol, stating only that it "considered the mitigating factors" presented. *See* A.R.S. § 13–701(E). We presume the trial court considered the relevant sentencing information, knew and followed the law, and did not silently create and apply contrary rules of law. *State v. Medrano*, 185 Ariz. 192, 196, 914 P.2d 225, 229 (1996). As to the fact the court added alcohol terms to the conditions of Clary's probation, we find no error. Under Rule 27.1, Ariz. R. Crim. P., "[t]he sentencing court may impose on a probationer such conditions as will promote rehabilitation." Moreover, because Clary failed to object when the court included alcohol-related terms to his probation, he

## CONCLUSION

**¶56**        We affirm Clary's convictions and sentences.  The trial court's
September 13, 2013 sentencing minute entry is affirmed as modified.



Amy M. Wood • Clerk of the court
FILED:  AA

---

has forfeited this claim for all but fundamental error.  *See Henderson*, 210
Ariz. at 567-69, ¶¶ 19-26, 115 P.3d at 607-09.  Clary does not assert that the
court violated Rule 27.1 or that the imposition of alcohol terms amounted
to fundamental error, and we find no such error.  Accordingly, we affirm
the conditions of Clary's probation.